**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                             Case No. 2:19-cr-150-SPC-NPM-1

**ALEX JARED ZWIEFELHOFER,**

        **Defendant.**

_____/

**DEFENDANT'S FIRST MOTION TO CONTINUE TRIAL AND TO EXTEND DEADLINES WITH AN AMENDED SCHEDULING ORDER**

Defendant Alex Jared Zwiefelhofer, through his undersigned counsel, moves in the interest of justice under Rule 12(c)(2) and the Fifth, Sixth, Eighth and Fourteenth Amendments to continue the trial and to extend the filing deadlines in this capital case so that reliable legal and factual determinations can occur, and respectfully states the following:

1.  Mr. Zwiefelhofer is eligible for capital punishment because his indictment (Doc. 6) alleges that a death occurred during a robbery in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1), and 2.

2.  The scheduling order (Doc. 21) entered after arraignment on October 11, 2019, set trial to occur during the December 2, 2019, trial term, with a status conference to occur on November 12, 2019, and otherwise created deadlines for the Parties to exchange discovery, file notices and motions.

3.  Conversations between Assistant United States Attorney Jesus Casas and

the undersigned have included that the United States will invite the defense to submit mitigation and reasons why the death penalty is inappropriate, and that information would be included in a memorandum that the local U.S. Attorney's Office will submit to the United States Attorney General for a determination as to whether capital punishment should be sought in accordance with the United States Department of Justice protocol[1] in capital cases. Attachment A.

4. Mr. Zwiefelhofer also anticipates filing for the appointment of Learned Counsel to assist in this matter pursuant to 18 U.S.C. § 3005.[2]

5. The standard time limitations imposed in the scheduling order (Doc.21) do not allow adequate time for meaningful investigation and effective representation of Mr. Zwiefelhofer in the context of a capital prosecution. The current deadlines for exchanging relevant discovery, filing notices and motions and fully litigating this case are not in the interest of justice and are instead unreasonable under the current standards that apply to this complex federal capital litigation.

6. Thus, proceeding as currently scheduled in this complex case is against the interest of justice, in that it constitutes a denial of Due Process and a denial of effective representation that will lead to an unreliable sentence, all in violation of the Fifth, Sixth,

---

[1] U.S.A.M. Chapter 9-10.00, at https://www.justice.gov/usam/usam-9-10000-capital-crimes.

[2] In pertinent part, 18 U.S.C. § 3005 states, "Whoever is indicted [for a capital crime] shall be allowed to make his full defense by counsel: and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases[.] In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender Organization[.]"

Eighth and Fourteenth Amendments to the United States Constitution.

7. A waiver of speedy trial through December 31, 2020, will be signed by Mr. Zwiefelhofer and provided to the Court.

8. A declaration provided by Kevin McNally[3] from August 2014, states that the "average time between indictment and the trial date in federal capital cases, from 2004 forward, which actually began trial, is approximately 36.5 months. The average time between indictment and the notice of intent to seek the death penalty is 16. 1 months. The average time between the notice of intent to seek the death penalty and the trial date is approximately 20.4 months." Attachment B.

9. Undersigned counsel has contacted AUSA Jesus Casas and the United States of America does not oppose the continuance sought in this motion.

**MEMORANDUM**

For the reasons set forth above and as explained more fully below, Mr. Zwiefelhofer requests that the trial be continued for one year and that the filing deadlines be extended by issuance of an amended scheduling order to allow meaningful investigation and preparation in conformity with standards of practice for litigation of federal capital cases. In the event that the United States files a formal notice that capital punishment is not being sought, the matter should then be returned forthwith to the normal docket and a status hearing should be expediently scheduled to determine whether trial can occur during the

---

[3] Kevin McNally formally served as the Director of the Federal Death Penalty Resource Counsel Project that is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

next available trial term. In so moving, Mr. Zwiefelhofer submits that the ends of justice are best served by continuing this complex matter and he relies upon his Sixth Amendment right to effective assistance of counsel, his Fifth and Fourteenth Amendment rights to Due Process of law, and his Eighth Amendment right to a reliable penalty determination in the context of a capital case.

In that regard, the Sixth Amendment of the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district where the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance[4] of Counsel for his defence." Trial courts have the inherent power to control their own docket and to schedule matters to accommodate the interests of justice. See, e.g., *Clinton v. Jones*, 520 U.S. 681, 707 (1997) (Affirming district court's "broad discretion to stay proceedings as an incident to its power to control its own docket."). The decision of whether to grant or deny a continuance "is left to the sound discretion of the trial judge, and his discretion will not be set aside absent a showing of a clear abuse of that discretion."

---

[4] The Sixth Amendments right to "Assistance of Counsel" means the effective assistance of counsel as provided within the legal community. *Strickland v. Washington*, 466 U.S. 668 (1984). Effective assistance of counsel requires having a reasonable period of time for the attorney to investigate the accusation, to develop information needed to confront adverse witnesses, to identify and locate favorable witnesses subject to compulsory process, to research possible legal defenses and to otherwise prepare for trial by an impartial jury.

*United States v. Warren*, 772 F.3d 827, 837 (11th Cir. 1985); *United States v. Stitzer*, 785 F.2d 1506, 1516 (11th Cir. 1986) (same).

In exercising that broad discretion, however, district courts are necessarily constrained by 18 U.S.C. §§ 3161 *et seq.*, also known as the "Speedy Trial Act." Under the Speedy Trial Act, a continuance is statutorily authorized when, as here, the ends of justice support it or, stated another way, when the denial of a requested continuance would "result in a miscarriage of justice."[5] In making that required determination in the form of an express finding as to whether the ends of justice support a continuance, the district court judge must consider specific criteria contained in the Speedy Trial Act, including whether the case is too complex to reasonably expect adequate preparation within the Speedy Trial Act deadlines[6] and whether the refusal to grant a continuance would deny either Party time for "effective preparation."[7] Both of those justifications warrant granting the requested continuance here and an express "interest of justice" finding is here fully supported by the facts and the law.

## COMPLEXITY OF CAPITAL PUNISHMENT LITIGATION

Two attorneys, "at least 1 of whom shall be learned in the law applicable to capital cases", are statutorily required in every federal capital case under 18 U.S.C. § 3005 because capital litigation is very complicated and very different from other criminal cases. See *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("[T]he penalty of death is

---

[5] 18 U.S.C. § 3161(h)(7)(B)(i).
[6] 18 U.S.C. § 3161(h)(7)(B)(ii).
[7] 18 U.S.C. § 3161(h)(7)(B)(iv).

qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). In referring to "justice" in the context of capital punishment, the *Woodson* opinion explains the Eighth Amendment implications:

> This Court has previously recognized that "(f)or the determination of sentences, <u>justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender</u>." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937).
>
> Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams v. New York*, 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman v. Georgia*, 408 U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C. J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, <u>we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment</u>, see *Trop v. Dulles*, 356 U.S., at 100, 78 S.Ct., at 597 (plurality opinion), <u>requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process</u> of inflicting the penalty of death.
>
> *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (Underlining added for emphasis).

The "fundamental respect for humanity underlying the Eighth Amendment" that is "a constitutionally indispensable part of the process of inflicting the penalty of death" recognized in *Woodson* drives the need for procedural Due Process under the Fifth and Fourteenth Amendments, including the need for the meaningful assistance of counsel under the Sixth Amendment. See *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932) ("The right to

6

be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel."). Mr. Zwiefelhofer is charged with a possible capital offense. The United States is actively proceeding under its formal protocol that calls for presentations to be made by defense counsel to persuade the United States Attorney General not to seek the death penalty.

The complexity of federal capital litigation is shown by the statutory requirement of two attorneys, one of which must be "learned counsel" in capital litigation under 18 U.S.C. § 3005. This requirement is not found in other cases. More specifically, 18 U.S.C. § 3005 in part directs that, "[w]hoever is indicted for treason or other capital crime shall be allowed to make his *full* defense by counsel; and the court *shall* promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases[.]" In that regard, counsel in capital cases are ethically[8] and constitutionally required to conduct a thorough and exhaustive investigation of the alleged crime and the entire background of the accused in order to locate, develop and meaningfully present all relevant considerations to persuade those involved with the prosecution and the sentencing that the death penalty should not be authorized or imposed. One crucial area of investigation involves the finding of "mitigation," this is a term that

---

[8] See, e.g., *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003), Commentary to Guideline 10.2 ("once a client is detained under circumstances in which the death penalty is legally possible, counsel should proceed as if it will be sought … Counsel must continue to treat the case as capital "until the imposition of the death penalty is no longer a legal possibility")(Emphasis added).

7

has a broad umbrella and a "low threshold" to be deemed relevant. Counsel are required to fully investigate all known sources that could produce mitigation and/or decrease the weight of aggravating considerations.

The complexity of capital litigation and need for learned counsel is shown by instances where even experienced courts have totally misperceived what constitutes "mitigation" and rejected evidence and argument in the context of capital punishment:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina,* 494 U.S. 433, 440-441, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard-" ' "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" ' "-applies. *Id.,* at 440, 110 S.Ct. 1227 (quoting *New Jersey v. T.L. O.,* 469 U.S. 325, 345, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). We quoted approvingly from a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.' " 285 494 U.S., at 440, 110 S.Ct. 1227 (quoting State *v. McKoy,* 323 N.C. 1, 55-56, 372 S.E.2d 12, 45 (1988) (opinion of Exum, C. J.)). Thus, a State cannot bar "the consideration of ... Evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441, 110 S.Ct. 1227.
> Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. *Boyde v. California,* 494 U.S. 370, 377-378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (citing *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Penry I,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)); see also *Payne v. Tennessee,* 501 U.S. 808, 822, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death.... [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may

introduce concerning his own circumstances" (quoting *Eddings, supra,* at 114, 102 S.Ct. 869)). *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004). See *Smith v. Texas*, 543 U.S. 37 (2004) (same). In that regard, procedures that have long been in place and that have routinely passed constitutional scrutiny have later been determined to be invalid. See, e.g., *Hurst v. Florida*, 136 S.Ct. 616 (2016) (Holding that Florida's death penalty procedure that existed for 40 years violates the Sixth Amendment, overruling *Hildwin v. Florida*, 490 U.S. 638 (1989) (*per curiam)* and *Spaziano v. Florida*, 468 U.S. 447 1984)).

## **TIME FOR EFFECTIVE PREPARATION**

A second consideration under the Speedy Trial Act that warrants a one-year continuance in the context of this capital case is that denying such a continuance will deny the defense time for effective preparation in participating in the authorization process and preparing for a capital trial and possible penalty phase. The discovery reviewed to this point purports that Mr. Zwiefelhofer has traveled internationally and his actions in those foreign countries are expected to be the source of much litigation. Additionally, Mr. Zwiefelhofer was adopted as a child from a neglectful home and a thorough mitigation investigation must be performed regarding that adoption and the events surrounding it. These are just two examples of a myriad of issues to be explored and investigated.

Effective representation requires that defense look into each of these incidents and any corresponding court files. See, e.g., *Rompilla v. Beard*, 545 U.S. 374 (2005) (Defense counsel's failure to examine a court file concerning his client's prior conviction for rape and assault in capital case fell below the level of reasonable performance that prejudiced the defendant).

The United States has to date provided over 150 gigabytes of discovery that must be reviewed and analyzed. One objective is to discern possible direct mitigation and/or to

investigate leads contained therein in order to find relevant mitigation. This analysis must be conducted while bearing in mind that explanation of possible aggravating considerations used to impose the death penalty is also a component of presentation(s) under the DOJ protocol as well as at trial and/or sentencing. See, e.g., *Lockett v. Ohio*, 438 U.S. 586 (1978) (The Eighth and Fourteenth Amendments require that the sentencer must be able to give weight to aspects of the defendant's character and record and circumstances of the offense as factors that may call for a less severe penalty). Much more discovery is expected based upon representations by the government.

Stated simply, the investigation into "mitigation" takes time, and the Department of Justice protocol gives defense counsel two opportunities to present mitigating considerations and to weigh in on whether the death penalty will be sought for the particular person accused of committing a particular crime. One presentation of mitigation and argument occurs at the local level and, if necessary, a second presentation is made to the Department of Justice. Of particular relevance to this motion to continue is achieving enough time to conduct a thorough investigation and to prepare a meaningful presentation. If successful at this first opportunity to convince the United States Attorney that authorization should not be requested, this may quickly remove the specter of the death penalty. Accordingly, the case could then continue as any criminal prosecution without the costs and issues necessarily embodied in capital litigation.

A "reasonable opportunity" is at the very least an adequate time to conduct a meaningful investigation into the existence of mitigation. This investigation must include an exhaustive analysis of the evidence underlying the offense and known background of

Mr. Zwiefelhofer. However, there is no requirement for mitigating evidence to have *any* nexus with the actual crime and mitigating factors include any consideration occurring during a defendant's life that may weigh against imposition of capital punishment. See, e.g., *Smith v. Texas*, 543 U.S. 37, 45 (2004) (Reiterating that a "nexus" requirement between mitigating considerations and the offense for such factors to be relevant was rejected in *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004)). The very purpose of the meeting with the local United States Attorney and, if necessary, the United States Department of Justice is for the defense to bring to their attention facts and circumstances that weigh against seeking capital authorization. The recommendation of the United States Attorney is a key component – indeed, in practice, virtually a determinative one – as to the Attorney General's ultimate decision. A decision not to seek capital punishment early on obviates the need to continue costly capital litigation and trial preparation. The United States Attorney General has an expedited process in place if it can be demonstrated that the death penalty is, for whatever reason, unwarranted.

To promote efficiency and costs control in regulating complex federal capital litigation, Chapter 6, § 670 of the Guide to Judiciary Policy "Scheduling of Federal Death Penalty Case Authorization to Control Costs" provides that, "Within a reasonable period of time after appointment of counsel under 18 U.S.C. § 3005, and only after consultation with counsel for the government and for the defendant (including, as appropriate, in an *ex parte* application or proceeding), the court should establish a schedule for resolution of whether the government will seek the death penalty." The schedule should include dates for:

>   (b)(1) the submission by the defendant to the U.S. Attorney of any reasons why the government should not seek the death penalty;
>
>   (2) the submission by the U.S. Attorney to the appropriate officials of the DOJ of a recommendation and any supporting documentation concerning whether the death penalty should be sought; and
>
>   (3) filing of a notice under 18 U.S.C. § 3593(a) that the government will seek the death penalty, or notification to the court and the defendant that it will not.
>
>   (c) The schedule should be flexible and subject to extension for good cause at the request of either party (again, as appropriate, in an ex parte application or proceeding).
>
>   (d) The schedule should allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought, with due regard to:
>
>   - the factual complexity of the case;
>   - the status of any continuing investigation of the crimes and related criminal conduct;
>   - the anticipated or actual progress of discovery;
>   - the potential for successful plea negotiations; and
>   - any other relevant factors.
>
>   (e) It is also recognized that scheduling extensions may be necessary because the full development of facts related to guilt and aggravating and mitigating factors may continue even after the case is submitted to the DOJ for review.

Chapter 6, § 670 of the Guide to Judiciary Policy "Scheduling of Federal Death Penalty Case Authorization to Control Costs."

The above benchmarks stem from a September 2010 update to the Spencer Report (Appendix C), prepared jointly by the Defender Services Committee and the Office of Defender Services that re-affirmed the cost-saving that occurs if capital litigation is avoided by effective mitigation presentations during the authorization process:

>The Department of Justice can do this by evaluating and streamlining its procedures. Judges can do this by establishing reasonable deadlines and maintaining oversight during the pre-authorization stage of the litigation. <u>Courts should ensure, however, that whatever decision-making timetables are imposed are sufficient to allow for meaningful pre-authorization advocacy by counsel for the defendant. Where authorization to seek the death penalty is significantly likely, the prosecution and the defense should be given every opportunity to explore the reasons for not authorizing or for negotiating an early disposition of the case.</u>

J.B. Gould and L. Greenman, *Report to the Committee on Defender Services Judicial Conference of the United States Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* (September 2010) (Emphasis added). The cost of competent representation at the front of a capital case results in avoiding a costly retrial of a capital case where counsel was ineffective in his or her representation of a capital defendant.

In 1989, the American Bar Association first promulgated standards for counsel in death penalty cases. In 2003 those guidelines were modified and up-dated. The official and final version of the 2003 Guidelines, together with approved commentary, is published in the Hofstra Law Review: "American Bar Association: Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L. REV. 913 (2003). In 2008, the Hofstra Law Review published an issue devoted almost entirely to the announcement of guidelines for the mitigation function of defense teams in capital cases. Article, "Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases," 36 HOFSTRA L.REV.663 (2008). Rather than include the volume as an appendix, the material can be viewed online at http://www.hofstralawreview.org/tag/volume-36-issue-3/.

The 2003 American Bar Association ("ABA") guidelines that are currently controlling set forth the following guidance for practitioners concerning trial and penalty-phase investigation and preparation. In part, <u>GUIDELINE 10.7 - INVESTIGATION</u> directs that "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty", and <u>GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL</u> states in part, "As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." In discussing the scope of the investigation to be undertaken pursuant to Guideline, the A.B.A. Commentary directs:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:
>
> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide

14

      necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;

(4) Military service, including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services). 2003 A.B.A. Guidelines. Of particular note is the supplementary A.B.A. Guideline 4.1 added in 2008, stating in part that, "In performing the mitigation investigation, counsel has the duty to obtain services of persons independent of the government and the right to select one or more such persons whose qualifications fit the individual needs of the client and the case." This guidance seems especially apposite in the context of appointment of Learned Counsel under 18 U.S.C. § 3005.

  The importance of the ABA Guidelines may not be overstated for, in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), the Court cited the ABA standards in 1989 as setting the benchmark for "determining what is reasonable" to expect of counsel in a capital case. *Wiggins* thus stands for the proposition that the "prevailing professional norms" under *Strickland v. Washington*, 466 U.S. 668 (1984) by which performance of counsel in a capital case are measured are set forth in the A.B.A. standards. In that regard under the 1989 A.B.A. Guidelines, "In cases where the death penalty is sought, two qualified trial attorneys should be assigned to represent the defendant." This essentially mirrors the

15

requirement under 18 U.S.C. § 3005 that the court shall, upon the defendant's request, promptly "assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases."

As further set forth in the statute, the assignment of counsel under 18 U.S.C. § 3005 should be done with consideration of the recommendation of the Federal Public Defender Organization. Here, the request and recommendation by the Federal Defender for the appointment of Learned Counsel will be forthcoming. In that regard, attorneys within this Federal Defender's Office have experience in capital litigation, but no assistant federal defenders in this office have ever represented a defendant during a penalty phase of a *federal* capital trial or capital sentencing, and it is believed that learned counsel under 18 U.S.C. § 3005 is necessary to assist in the effective representation of Mr. Zwiefelhofer.

The final point that warrants mentioning in assessing whether the interests of justice required to grant a continuance under the Speedy Trial Act are present here is to respectfully once again point out that death-penalty jurisprudence is "different" from other criminal cases. That truism was reiterated in *Gardner v. Florida*, 430 U.S. 339 (1977):

> [D]eath is a different kind of punishment from any other which may be imposed in this country. From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. *Gardner*, 430 U.S. at 357-58.
>
> The principle that "death is different" is not simply the dramatic recitation of a self-evident truth; rather, it forms the bedrock of death-penalty jurisprudence that began in 1976 and is marked and refined by a justly deserved increased level of judicial attention to every step of the process through which the irrevocable sanction of death is sought and carried out.

>The post-*Furman* Court has described this jurisprudence as mandating a "heightened standard of reliability" for the entire process through which the sovereign claims the legal and moral authority to kill one of its citizens. This heightened concern for reliability is "the natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). See *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985)("[T]he qualitative difference of death from all other punishments *requires* a correspondingly greater degree of scrutiny of the capital sentencing determination.") (emphasis added).

Stated simply, the ends of justice in this capital case warrant a continuance that can be revisited in the event the United States files a formal notice that it is not authorizing imposition of the death penalty. Unless that occurs, more time is needed in this complex case to provide effective representation of Mr. Zwiefelhofer by his appointed counsel

**WHEREFORE**, this Honorable Court is respectfully asked to grant a one year continuance of the trial and to extend the times within which to file notices and motions in accordance with a new scheduling order, with the proviso that, should the United States file notice that it is not authorizing the death penalty, the case will automatically revert to the normal trial docket and will be called up at the next scheduled status hearing.

DATED this 8th day of November 2019.

Donna L. Elm
Federal Defender

/s/ *D. Todd Doss*
D. Todd Doss
Florida Bar No. 0910384
Assistant Federal Defender
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: 407-648-6338
Fax: 407-648-6095
E-Mail: todd_doss@fd.org

*/s/ Erin B. Hyde*
Erin B. Hyde
Florida Bar No. 0026248
Assistant Federal Defender
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: 407-648-6338
Fax: 407-648-6095
E-Mail: erin_hyde@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that undersigned electronically filed the foregoing *Defendant's First Motion to Continue Trial and to Extend Deadlines with an Amended Scheduling Order* with the Clerk of Court (CM/ECF) by using the CM/ECF system which will send a notice of electronic filing to the Office of the United States Attorney, this 8th day of November 2019.

/s/ D. *Todd Doss*
Assistant Federal Defender