UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                Case No. 2:19-cr-150-SPC-NPM

ALEX JARED ZWIEFELHOFER,

    Defendant.
_____/

## MOTION TO SUPPRESS STATEMENTS

Defendant Alex Jared Zwiefelhofer, by counsel, moves this Court to enter an Order suppressing his statements pursuant to Federal Rules of Criminal Procedure 12(b)(3)(C) and 41(h) and the United States Constitution's Fifth Amendment protections against self-incrimination by failing to stop questioning after a request for an attorney. Mr. Zwiefelhofer moves to suppress any and all statements which he made on August 2, 2017, to law enforcement agents at Charlotte Douglas International Airport. [1]

## FACTUAL BACKGROUND

According to discovery, Charlotte Douglas International Airport (CLT) Customs and Border Protection (CBP) Officers were notified that Alex Jared Zwiefelhofer had been released from US Army custody at London Heathrow

---

[1] AUSA Casas has been contacted and the Government objects to this motion.

1

Airport to return to the United States on August 2, 2017.[2] Diplomatic Security Services advised CLT CBP Officers that Mr. Zwiefelhofer had been turned over to the US military by Kenyan authorities after being apprehended while attempting to illegally enter South Sudan from Kenya.[3]

That same day, Special Agent (SA) Kristen L. Sheldon and Officer Michael Newsom, who is both a CBP Officer and a Federal Bureau of Investigation (FBI) Task Force Officer, interviewed Mr. Zwiefelhofer.[4] Four other unknown agents interrogated Mr. Zwiefelhofer. These interviews occurred in the Charlotte International Airport upon Mr. Zwiefelhofer's arrival from London, England. Mr. Zwiefelhofer had been handcuffed and taken into custody on the airplane. He was then brought to an office inside the airport away from the public and told he was not free to leave.

The FD-1057, dated August 4, 2017, provided in discovery states that Mr. Zwiefelhofer was advised of his rights (as outlined in FD-395) and was informed of the penalties associated with making false statements to the FBI (as outlined in US Code, Title 18, Section 1001). See *Miranda v. Arizona*, 86 S.Ct. 1602 (S.Ct. 1966). Moreover, Mr. Zwiefelhofer unequivocally asked for a

---

[2] See APPENDIX A.
[3] See APPENDIX B.
[4] *Id.*

2

lawyer after he was read the *Miranda* warnings and was told he was not leaving until he talked to them.

The FD-1057 adds that Mr. Zwiefelhofer provided the following information:

> Zwiefelhofer joined the Army in early 2015, perhaps in February of 2015, to go to war. He attended and successfully completed Airborne School and Ranger Selection. He exercised an Option 40 and his orders were cut for Ft. Bragg. At Ft. Bragg he was assigned as a Ranger for one week and then was cut. He was then assigned to the 82nd Airborne, Infantry, Unit 2325, B Company. Until recent, Unit 2325 had not deployed OCONUS in over eight years; Unit 2325 is known as a Parade Brigade.
>
> In September of 2016, Zwiefelhofer applied for a US Passport and paid the extra $50 for expedited (3 day) processing and delivery, in order to go AWOL from the US Army. Zwiefelhofer did not request a leave of absence; he departed on a regular four day weekend. Prior to departing Ft. Bragg, Zwiefelhofer and individuals in his Unit were discussing each others' plans for the four day weekend. Zwiefelhofer told the group "I'm fucking going AWOL". (sic)
>
> Zwiefelhofer was in a really bad state of mind at Ft. Bragg. Leadership was pulling schools from him, fucking with his money, and he was dealing with personal things. Zwiefelhofer had his car tires slashed, was in a motorcycle accident and his "insurance companies said fuck myself". Zwiefelhofer felt singled out by his leadership who knew he was experiencing financial issues and everyone
> knew he had a drinking problem, but yet they piled on by making Zwiefelhofer make packing lists for schools which they knew he would not be attending. Zwiefelhofer had had three alcohol issues while at Ft.

Bragg. He attended alcohol abuse classes and was recommended for a behavior rehabilitation program but was told by his leadership he couldn't go.

On 09/25/2016, Zwiefelhofer flew from Boston to France with a layover in London. In London, Zwiefelhofer got trashed. Zwiefelhofer spent five days in Paris, ten days in Albene (phonetic) near Marseille, and 7 - 8 days in Germany (Frankfurt, Munich, Saarbrucken).

Zwiefelhofer went to Paris to join the French Foreign Legion (FFL) because he was told they traveled everywhere and fought. Zwiefelhofer passed the selection process for the FFL and went civil. He soon left the FFL because he learned that you needed to have 8+ years of service prior to being deployed and that since Mali (presumably the November 2015, terror takeover of the Radisson Blu Hotel in Bamako, Mali in which 170 hostages were taken and 20 were killed) the FFL had not deployed.

Zwiefelhofer left the FFL with 1,000 Euros. He didn't want to return to the US because he knew the Army had issued a warrant for his arrest. He was torn between traveling to the Ukraine or Kurdistan. He ultimately decided to travel to the Ukraine because of advice he received from "Duchess". Duchess is a friend of a friend in the FFL that Zwiefelhofer met on Facebook. Zwiefelhofer's FaceBook account is his name (first and last). Duchess changes his Facebook name every week. Duchess is from Holland, speaks Georgian, is a war tourist and has no combat experience. Duchess said it was more difficult to get into Kurdistan so on 10/25/2016 Zwiefelhofer traveled to the Ukraine and met Duchess for the purposes of going to war.

Zwiefelhofer met Craig Austen Lang in the Ukraine two days after Zwiefelhofer arrived. He had originally contacted Lang via Facebook while Zwiefelhofer was

4

in Poland. Zwiefelhofer fought with Lang in the Right Sector which was a volunteer battalion fighting against Russian separatists who are terrorists who get money and weapons from the Russian government. Zwiefelhofer never witnessed Lang conduct any war crimes or participate in any bad behavior.

Zwiefelhofer was a witness to war crimes, but he didn't care because those involved were separatists. Zwiefelhofer witnessed chlorine - for making mustard gas, and POWs get their fingers cut off.

Zwiefelhofer fought in the Ukraine for ten months. Lang fought in the Ukraine for 2 years; 17 months straight. Lang and Zwiefelhofer were part of a small team that was paid by SBU - $100 per person/prisoner /separatist and $500 per Russian soldier (identified by uniform, name tag, documents, etc.). Open Source indicates SBU is the Security Service of Ukraine. Zwiefelhofer described the SBU as the KGB. The Ukrainians were good about giving prisoners to the SBU. Payment was for alive bodies. Zwiefelhofer can't recall how much money he was paid; he spent a lot of his money on vodka. As a team, Zwiefelhofer and others captured approximately 30 people, more Russians than separatists, and provided the bodies to the SBU.

Zwiefelhofer was asked if he ever shot at anyone OCONUS and his response was "Is it legal for me to do so?". Zwiefelhofer reiterated that he was a medical volunteer and shot weapons for training purposes. Zwiefelhofer shot the following weapons: AKs, SPDs, RPGs, Mukas (phonetic) AGFs, a tank and whatever was in the Soviet arsenal. Blown up tanks were used as targets for the RPGs.

While in the Ukraine, approximately every 15 minutes mortars and artillery was blindly and randomly shot into the air. From this, Zwiefelhofer was shot and has shrapnel around his left hip. When this happened,

5

Zwiefelhofer was smoking a Ukrainian cigarette while seated in a chair next to his wife. His wife's SR21 was near. But Zwiefelhofer responded by shooting ten grenades with an AGS and then
continued smoking with his wife.

In the Ukraine Zwiefelhofer claimed to have met the Boston Bombers' father. Zwiefelhofer stated his name was Mansour and his translator's name was Habib and that they both left the Ukraine and went to Syria.

Zwiefelhofer's wife is 27 years old. They do not have children. Their marriage will not be official until Zwiefelhofer can prove to the Ukrainian government that he is not married in the US.

Although Zwiefelhofer would not discuss any biographical information about his wife, an open source search of Zwiefelhofer's Facebook revealed that his wife is most likely Julia Vobornikova who is from Prague, Czech Republic according to her Facebook. There are many pictures of her and Zwiefelhofer together. She has many pictures of her dressed in sniper attire and holding weapons which could be construed as being long range rifles. She also has pictures of her dressed in medical clothing.

Zwiefelhofer often portrayed himself as a CIA operative because he did not believe the foreign governments believed in "war tourists". (sic)

In mid May 2017, the Ukraine started enforcing peace talks and so Zwiefelhofer decided to leave. He did not want to return to the US because of the AWOL warrant issued by the US military. Zwiefelhofer's plan was to fuck around from war to war for ten years and then return to his military Unit; by that time everyone would be new, they would not know him, and they would quickly chapter/discipline him and be done. He was interested in fighting in the South Sudan, Libya, Philippines and in Somalia against Al Shabab.

6

While in the Ukraine, Zwiefelhofer was part of a group text of approximately 25 people who called themselves the Sloth Team 6. Dutchess was not a part of this group. The group considered themselves a Commando Platoon.

Zwiefelhofer left the Ukraine and went to Kiev. William's mom did William's taxes and he had money for 3 commercial plane tickets on Kenya Airways. (William is presumed to be William Wright-Martinovich) Zwiefelhofer, Lang and Wright-Martinovich traveled to Kiev, then Dubai, then Nairobi because they wanted to help fight against Al Shabab. And if that didn't work out, the Congo was close and they would travel there.

Zwiefelhofer, Lang, and Wright-Martinovich were in Kenya for approximately three days. They met with local contacts in an effort to obtain contract work, but they were extorted for money and all their gear. Zwiefelhofer had three pairs of American made night vision goggles taken from him; ones which he took from dead Russians and prisoners in the Ukraine. Being white in Kenya "is pretty fucking cool". Zwiefelhofer, Lang and Wright-Martinovich were able to easily pass through two checkpoints because they were white and the Kenyan's believed them to be CIA operatives. At a third checkpoint, they were scrutinized more severely by the Kenyan's who called the second checkpoint to confirm their statements of being CIA. Zwiefelhofer, Lang and Wright-Martinovich had to take off from the third checkpoint.

Zwiefelhofer, Lang and Wright-Martinovich crossed into South Sudan. They wanted to be volunteers for the Army of Sudan. Their passports were stamped. But they could not pay the $100 visa fee. However, since they said they wanted to fight with the military, the border guards didn't care that they could not pay the visa fee and did not care why they wanted to join

7

the army. The border patrol pointed for the three to walk towards the bushes. The Sudan population thinks American military personnel are all like Rambo or Arnold Schwarzenegger. Zwiefelhofer, Lang and Wright-Martinovich were eventually stopped by South Sudan police who were surprised that three white guys were in the middle of the Sudan. They called the Kenyan's and the Kenyan's informed the South Sudan authorities that the three white guys were part of Al Shabab. The South Sudan police began to shoot weapons at the three but missed. Zwiefelhofer was sent to Kenya in a cargo container and remained in there for a week; he, Lang and Wright-Martinovich were robbed by the Kenyan authorities of approximately $300. Zwiefelhofer had hoped to go to the Capital of the South Sudan as a poorly paid mercenary/contract person.

Zwiefelhofer will not fight ISIS because it is a conspiracy. He has had friends who have fought against ISIS and then become subjects of FBI investigations.

Zwiefelhofer will fight Al Shabab. Zwiefelhofer would have spend $20 on the black market to purchase a weapon to fight against Al Shabab.

Zwiefelhofer will fight groups in the Philippians to live out a Vietnam War fantasy.

Zwiefelhofer will fight in Libya with the Tripoli government against Russians because he doesn't care for Russians.

Zwiefelhofer is not a fan of the Jews.

Zwiefelhofer will fight against Hizballah.

Zwiefelhofer on principal doesn't like jihadis or Hamas.

Zwiefelhofer doesn't like the British but isn't going to go to war with them.

Zwiefelhofer will disagree verbally with Americans but will not kill his brothers.

Zwiefelhofer's Unit is currently deployed in Iraq. The Unit deployed while Zwiefelhofer was at Ft. Bragg, but Zwiefelhofer was not allowed to deploy due to an underage drinking issue. Zwiefelhofer's Unit is bored in Iraq and jealous of Zwiefelhofer. They wish they had gone with Zwiefelhofer because being deployed to Iraq sucks.

Zwiefelhofer utilizes an Instagram account, which he can't recall, but is linked to his Facebook account.

Zwiefelhofer grew up shooting deer, bear, rabbits and squirrel. He ate the heart of the first deer he shot.

Zwiefelhofer's back was pretty fucked and he was getting injections for the pain.

Zwiefelhofer last communicated with Lang a few days ago via a group text; Lang and Brandon (NFI) can't get jobs.

The only American Zwiefelhofer encountered OCONUS was Chris Allen, a journalist he met in Kiev.

Zwiefelhofer and his wife have job offers from the Ukraine government, in positions much like Ft. Bragg's ASOG. However, they might want to go to Libya to join the Tripoli government and live out Zwiefelhofer's ten year war tourist fantasy.[5]

---

[5] See APPENDIX C.

Additionally, Mr. Zwiefelhofer was questioned by Homeland Security Investigations (HIS) and the Charlotte Mecklenburg Police Department (CMPD).[6] Mr. Zwiefelhofer was arrested immediately after questioning by the various law enforcement agents by Charlotte Mecklenburg Police Department (CMPD) for five felony counts of sexual exploitation of a minor and transported to the Mecklenburg County jail.

## II. MEMORANDUM OF LAW

**A. Mr. Zwiefelhofer's statements should be suppressed because they were taken in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966) and *Edwards v. Arizona,* 451 U.S. 477 (1981).**

"[A] suspect is entitled to the assistance of counsel during custodial interrogation . . ." *Davis v. United States*, 512 U.S. 452, 462 (1994)(citing *Miranda v. Arizona,* 384 U.S. 436 (1966). "If the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present." *Davis* at 462 (citing *Edwards v. Arizona*, 451 U.S. 477 (1981). This right inures under the Fifth Amendment right to counsel and is explained in *Miranda*:

> The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments

---

[6] See APPENDIX D.

10

> of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time. See *Miranda v. Arizona*, 86 S.Ct. 1602 (S.Ct. 1966).
>
> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him. *Id*.

The Supreme Court explained that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the

11

subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U S. 318, 114 S. Ct. 1526, 1529 (1994) (per curiam). The Court reasoned that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984)); see also *Illinois v. Perkins*, 496 U.S. 292 (1990).

Determining whether an individual is in custody for *Miranda* purposes is harder when the individual has not explicitly been told that he or she is under arrest but has, nonetheless, been deprived of some freedom. The *Miranda* safeguards come into play whenever a person in custody faces either express questioning or its functional equivalent. *R.I. v. Innis*, 446 U.S. 291, 300-301 (1980). The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Id.* A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. *Id.* Additionally, "[t]he principle psychological factor contributing to a successful interrogation is *privacy* – being alone with a person under interrogation. *Illinois v. Perkins*, 496 U.S. 292 (1990) (citing *Miranda v. Arizona*).

12

Although routine border detention and questioning is permitted, once it becomes more, *Miranda* and Fifth Amendment protections attach. The Fifth Circuit[7] observed:

> However, when the border search or detention becomes more than routine, such as when a person is discovered to be concealing suspicious materials, or when a person is taken to a private room and strip searched as here, a different outcome obtains. *United States v. De La Cruz*, 7 Cir., 1970, 420 F.2d 1093; *United States v. Berard*, D.C. Mass., 1968, 281 F.Supp. 328.

*United States v. Salinas*, 439 F.2d 376, 380 (5th Cir. 1971).[8]

> Factors considered by courts to determine under what circumstances border interrogations rise to an accusatory level include whether the suspect was physically moved or restrained by officers during the interview, handcuffed or had guns drawn on him, booked or told of formal accusations, or told that he was under arrest. *Moya,* 74 F.3d at 1119; *Padilla,* 2006 WL 3678567, at *3. Additionally, courts consider whether the suspect asked to leave; whether an officer told the suspect that he could not leave; and whether the suspect made an inculpatory admission during the interview that would lead a reasonable person in his place to conclude that he would be arrested immediately if he attempted to leave. *Moya* at 1119; *Padilla* at *3; *United States v. McDowell,* 250 F.3d 1354, 1362 (11th Cir.2001).

*United States v. Charles*, CRIM.109-CR-386-TWT, 2010 WL 989937, at *3 (N.D. Ga. Feb. 16, 2010), <u>report and recommendation adopted,</u> CRIM.109-CR-386-TWT, 2010 WL 989936 (N.D. Ga. Mar. 15, 2010).

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[8] *Id.*

13

Mr. Zwiefelhofer was forcefully removed from his plane upon arrival at the airport, handcuffed, and moved to a locked office in an area inaccessible to the public, was told he could not leave, denied an attorney, and ultimately taken into custody. These facts establish Mr. Zwiefelhofer was in custody for *Miranda* purposes.

The custody analysis centers on whether a reasonable person would feel a restraint on his freedom of movement to such extent he would not feel free to leave. *See United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987); *see also United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). Here, the restriction on Mr. Zwiefelhofer's freedom of movement was to a degree associated with formal arrest when law enforcement entered his arriving flight, specifically sought only him out on the plane, cuffed him, and then removed him. Furthering the objective indications of arrest here is that Mr. Zwiefelhofer was then removed to an inside office within the airport that was inaccessible to the public. Even if Mr. Zwiefelhofer had been uncuffed, the request to move to the inside office would have weighed heavily towards custody. The Eleventh Circuit has held, "[a]n officer's asking an individual to accompany him or her to an office is an intrusive request that raises a presumption that the individual would not feel free to leave." *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1507 (11th Cir. 1986). The fact he was cuffed only furthers the conclusion Mr. Zwiefelhofer was in custody when questioned.

14

As does the fact the questioning was in a restricted part of the airport out of the view of the public. The Supreme Court in *Berkemer* thought it relevant that "exposure to public view both reduces the ability of the unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that if he does not cooperate, he will be subjected to abuse." *Berkemer* at 438.

Mr. Zwiefelhofer, unlike the Defendant in *Berkemer* was out of the public's view and in an unfamiliar environment. Yet another factor signifying he was in custody. The Supreme Court has treated this unfamiliarity as an important consideration when observing that "the principle psychological factor contributing to successful [custodial] interrogation was isolating the suspect in unfamiliar surroundings for no purpose other than to subjugate the individual to the will of the examiner. *Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976).  When different teams of agents interrogated Mr. Zwiefelhofer in this setting it created precisely the intimidating police dominated atmosphere *Miranda* was designed protect citizens from. The totality of the circumstances here establish that the interrogation and detention of Mr. Zwiefelhofer was custodial and the questions were interrogatory.

Custody and interrogation triggered the necessity for the FBI Agents to read Mr. Zwiefelhofer the *Miranda* warnings, which they did. However, when Mr. Zwiefelhofer requested a lawyer questioning should have immediately

15

ceased and did not. *Edwards v. Arizona*, 451 U.S. 477 (1981). There is a bright line rule that all questioning must cease once the request for counsel has been made. *Smith v. Illinois*, 469 U.S. 91, 98 (1984). Once Mr. Zwiefelhofer asked for a lawyer there should have been no more questioning. Yet, the agents told Mr. Zwiefelhofer he was not entitled to one, despite just reading the *Miranda* informing him he had such a right. The agents informed Mr. Zwiefelhofer that he was not leaving the airport until they were satisfied and continued interrogating Mr. Zwiefelhofer.

Mr. Zwiefelhofer never rescinded his request for a lawyer and never acceded to agents re-initiating their questioning after he requested an attorney. Therefore, none of the caselaw that addresses re-interrogation after invocation of right to counsel applies here.

The agents continued interrogation of Mr. Zwiefelhofer after he requested a lawyer violated Mr. Zwiefelhofer's Fifth Amendment rights and the *Miranda* and *Edwards* line of cases. This violation necessitates this Court suppress any and all statements Mr. Zwiefelhofer made to law enforcement during questioning at the Charlotte International Airport.

The undersigned conferred with Assistant United States Attorney, Jesus Casas who objects to the relief sought in this motion. Mr. Zwiefelhofer requests leave of Court to amend this motion at any time during its pendency.

## CONCLUSION

WHEREFORE, Alex Jared Zwiefelhofer requests this Honorable Court to schedule an evidentiary hearing on the merits of this pleading and grant his motion to suppress as his statements were obtained in direct violation of his constitutional rights.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER, MDFL

*/s/D. Todd Doss*
D. Todd Doss, Esq.
Assistant Federal Defender
Florida Bar No. 0910384
201 S. Orange Avenue, Suite 300
Orlando, FL 32801
Telephone: 407-648-6338
Fax: 407-648-6765
E-Mail: todd_doss@fd.org

*/s/Erin Brenna Hyde*
Erin Brenna Hyde, Esq.
Assistant Federal Defender
Florida Bar No.0026248
201 S. Orange Avenue, Suite 300
Orlando, FL 32801
Telephone: 407-648-6338
Fax: 407-648-6095
E-Mail: erin_hyde@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that undersigned electronically filed the foregoing with the Clerk of Court (CM/ECF) by using the CM/ECF system this 1st day of February 2023 which will send an electronic copy to all counsel of record.

*/s/Erin Brenna Hyde*
Attorney for Mr. Zwiefelhofer