UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                              CASE NO. 2S:19-CR-150-SPC-NPM

ALEX JARED ZWIEFELHOFER

**UNITED STATES' RESPONSE TO DEFENDANT'S
MOTION FOR DAUBERT HEARING**

The United States responds in opposition to the Defendant's Motion for Daubert Hearing, Doc. 143. The Florida Department of Law Enforcement (FDLE) participated in the investigation of the Defendant, Alex Jared Zwiefelhofer, by examining evidence to determine the presence of DNA. FDLE Crime Laboratory Analyst Christina Russo conducted the DNA analysis of items that were recovered from the scene of the crime involving the murders of S.L., Jr. and D.L. Ms. Russo used scientifically reliable methods that had undergone internal validation testing to conduct her analysis, including the use of STRMix v2.4 and v2.5.11, to determine the likelihood ratios associated with DNA evidence she examined. Item 25B, the swabs of the inside of the wallet of S.L., Jr., was the subject of DNA analysis by Ms. Russo. Ms. Russo detected the presence of a complex mixture of DNA, including one major contributor, believed to be S.L., Jr., and two unknown minor contributors. Based upon the FDLE validation and other available validation data, Ms. Russo was unable to render a conclusion regarding whether the Defendant's DNA appeared in the

mixture of DNA on Item 25B.

The Defendant's claim that STRMix results for analysis of complex DNA mixtures should be excluded under *Daubert* is unsupported by "conflicting medical literature and expert testimony." *Tanner v. Westbrook,* 174 F.3d 542, 546 (5th Cir.1999). As a result, this Court should deny the Defendant's motion for *Daubert* hearing.

## I. Background

### a. The Investigation of the Robbery and Murders of S.L., Jr. and D.L.

On Tuesday, April 10, 2018, at 7:14 a.m., the LCSO received a 911 call in reference to a deceased person found at 9351 Corkscrew Road, Estero, Florida, a commercial plaza adjacent to the area in which LCSO deputies responded eight hours earlier for the shots-fired calls for service. Upon arrival at the scene, deputies found a red GMC Canyon truck, with multiple gunshot defects, parked in the middle of the plaza. The truck had a disabled parking permit hanging from the rearview mirror and a disabled veteran vanity plate. During a cursory search of the immediate area, deputies located an obviously deceased male, suffering from multiple gunshot wounds, lying supine on the ground next to the front passenger side tire of the truck. The male decedent was later positively identified as S.L., Jr. Deputies also found a female decedent, likewise, suffering from multiple gunshot wounds, sitting in the front passenger seat of the truck. The female decedent was later positively identified as D.L.

Upon arrival, homicide detectives conducted a walk-through of the scene,

noting that on the ground adjacent to S.L., Jr. was a brown leather wallet, a Florida Driver's License belonging to S.L., Jr., and a bill of sale for a firearms transaction.  Further investigation resulted in the location of a cellular telephone under the body of S.L., Jr.  The cellular telephone was collected and taken to the LCSO Digital Forensic Unit for further analysis.  Until the cellular telephone was successfully downloaded, little to no information was available to law enforcement to understand why S.L., Jr. and D.L. were in Estero on the date of their murders.  The investigation of the robbery and murders of S.L., Jr. and D.L. was complex and would last for months as pieces of evidence were gathered.  Evidence gathered at the scene, including casings, the brown leather wallet, a pen and other items were swabbed for the presence of DNA.  Those swabs were then submitted to FDLE for DNA analysis and comparison.  At various points of the investigation, additional DNA analysis by FDLE was conducted as evidence was gathered and suspects were identified, including the Defendant.

FDLE Crime Laboratory Analyst Christina Russo[1] conducted examinations of evidence gathered from the scene of the crime.  Ms. Russo authored three reports that outlined her examinations and her conclusions, opinions and/or interpretations.  Only one item examined by Ms. Russo resulted in a mixture of DNA with three contributors – the interior swabs of the brown leather wallet, labeled as Item 25B.  According to Ms. Russo in her report dated October 9, 2019,

---

[1] The United States has provided the Defendant with a witness summary of the testimony Ms. Russo would provide at trial, pursuant to Federal Rules of Evidence 702, 703 and 705.  Doc. 132.  Attached to the summary was a copy of the curriculum vitae of Ms. Russo outlining her qualifications as an expert in DNA analysis.

S.L., Jr. (Item 18 was his DNA standard) was expected to be a contributor to the mixed DNA profile. No determination could be made as to whether D.L. was a contributor to Item 25B based upon insufficient statistical support for inclusion or exclusion.

Ms. Russo subsequently received a blood standard for the Defendant from which a DNA profile was obtained for comparison. Ms. Russo compared the Defendant's DNA profile (Item 22) to the mixture obtained from Item 25B and concluded that there was insufficient statistical support for inclusion or exclusion of the Defendant. As a result, Ms. Russo could make no determination regarding the contribution of the Defendant to Item 25B.

### b. The Basics of DNA

"DNA, or deoxyribonucleic acid, is a molecule that encodes the genetic information in all living organisms and has been used in the criminal justice system as a means of identifying individuals since the late 1980's." *People v. Blash*, No. 2015-CR-156, 2018 V.I. LEXIS 86, *7 (Super. Ct. V.I. Aug. 24, 2018). "The current standard for forensic DNA testing relies on an analysis of the chromosomes located within the nucleus of all human cells." *Maryland v. King*, 569 U.S. 435, 442–43 (2013).

Many of the patterns found in DNA are shared among all people, so forensic analysis focuses on "repeated DNA sequences scattered throughout the human genome, known as 'short tandem repeats' (STRs)." *Id.* at 147–48. "The alternative possibilities for the size and frequency of these STRs at any given point along a strand of DNA are known as alleles, and multiple alleles are analyzed in order to ensure that

a DNA profile matches only one individual." *Id.* Because the alleles vary, no two people are likely to have matching alleles at any given locus, which are spots on the human genome that contain segments of DNA code. *United States v. Gissantaner*, 990 F.3d 457, 461 (6th Cir. 2021). A greater number of matching alleles at a greater number of loci increases the probability that the person of interest matches the sample. *Id.*

   c. **DNA Testing Using Probabilistic Genotyping**

Probabilistic genotyping refers to the use of biological modeling, statistical theory, computer algorithms, and probability distributions to calculate likelihood ratios (LRs) and/or infer genotypes for the DNA typing results of forensic samples. Probabilistic genotyping is a tool to assist a DNA analyst in the interpretation of forensic DNA typing results. *Id.* A probabilistic genotyping system is particularly useful for low-level DNA samples (i.e., those in which the quantity of DNA for individuals is such that stochastic effects may be observed) and complex mixtures (i.e., multi-contributor samples, particularly those exhibiting allele sharing and/or stochastic effects). *Id.*

Probabilistic genotyping approaches can reduce subjectivity in the analysis of DNA typing results because the system uses methods that incorporate empirically determined biological parameter models and enable usage of more of the profile information. *Id.* In other words, probabilistic genotyping systems use mathematical algorithms to perform a systematic assessment of how likely the observed DNA mixture is to occur under various assumptions about the contributors. *United States v.*

*Lewis,* 442 F. Supp. 3d 1122, 1139 (D. Min. 2020).

   d. **STRmix Software**

STRmix is a probabilistic genotyping software used for the interpretation of forensic DNA profiles. It was created in 2011 by John S. Buckleton, a civil servant and forensic scientist who works for the Institute of Environmental Science and Research in New Zealand. *Gissantaner,* 990 F.3d at 462. The software helps to measure the probability that a mixture of DNA includes a given individual's DNA. Over 60 state and federal forensic laboratories use STRmix, including the FBI, ATF, and FDLE who began using STRmix in 2017.

STRmix has undergone numerous validation studies, and more recently, in 2018, 31 DNA laboratories contributed to the internal validation of STRmix in response to a report issued in 2016 by the President's Council of Advisors on Science and Technology (PCAST). Specific to this case, FDLE's validation of STRmix v2.4 was completed in May of 2017. This validation included testing to meet all internal validation guidelines found in the Scientific Working Group on DNA Analysis Methods ("SWGDAM") for the Probabilistic Genotyping Systems. SWGDAM publishes guidelines for the American forensic science community on a variety of topic including validations. SWGDAM is also responsible for recommending revisions to the FBI's Quality Assurance Standards regarding validation. The FDLE internal validation also met these Quality Assurance Standards regarding validation.

As part of the validation process, the FDLE lab performed internal validation studies on STRmix using laboratory specific parameters. These studies involved the

examination of more than 150 autosomal STR profiles, derived from 1 to 5 contributors and representing a wide range of contributor ratios, DNA template amounts, allele and locus drop-out, and sharing of alleles among contributors. Hypothesis testing was conducted with known contributors and non-contributors, totaling more than 400 known contributor propositions and more than 30,000 non-contributor tests. Further, a performance check of the STRmix software upgrade to v2.4.08 was completed by FDLE in August of 2017. A performance check of the software upgrade to v2.5.11 was conducted by FDLE in 2018 and completed and approved in May of 2019.  This performance check included in-depth studies on new software features, comparisons of results between v2.5.11 and 2.4, and regression testing to show that likelihood ratios could be calculated using v2.5.11 for sample results obtained with the previous software version.

The purpose of internal validation, specifically of STRmix, is to determine how the software functions in the FDLE laboratory environment, on data produced by the FDLE laboratories, to test the limits of the system, including with complex mixtures and samples with low-level contributors, and to set guidelines for interpretation based on the studies conducted.

Regarding mixture studies, and per the SWGDAM guidelines, FDLE tested a variety of mixtures with various[2] contributor ratios, DNA template amounts, and

---

[2] According to FDLE, it would not be feasible to test every possible contributor ratio with every variety of possible different DNA types that may be encountered in DNA casework as the make-up of casework samples is unknown.  Testing a range of various contributor ratios with differing amounts of DNA template and challenging the system with regards to contributor number and hypothesis testing sufficiently allows for determining that the software program is working for its intended purpose and for setting interpretation

numbers of contributors that were representative of what is seen in casework. These studies included hypothesis testing with known contributors and known non-contributors to examine the sensitivity and specificity of the software with regards to mixtures and to determine the limits of the system in distinguishing true contributors from known non-contributors.

### e. FDLE's use of STRmix and DNA Analysis for Item 25B

It is well recognized that STRmix meets the *Daubert* standard of reliability. *See United States, v. Christensen*, No. 17-CR-20037, 2019 WL 651500, at *2 (C.D. Ill. Feb. 15, 2019) (holding that "the evidence shows that STRmix has been repeatedly tested and widely accepted by the scientific community."); *Gissantaner*, 990 F.3d 457, 467 (6th Cir. 2021) (finding STRmix satisfies FRE 702 and . . . is the product of reliable principles); *United States v. Washington*, No. 8-19-CR-299, 2020 WL 3265142, at *5 (D. Nev. June 16, 2020) ("the evidence demonstrates that STRmix has been tested and subjected to peer review, is widely accepted by the relevant community, and has been examined and admitted in other courts of competent jurisdiction. [T]he evidence meets the *Daubert* threshold for admissibility."); *United States v. Tucker*, No. 18-CR-119, 2020 WL 93951, at *6 (E.D.N.Y. Jan. 8, 2020) (similar); *United States v. Pettway*, No. 12-CR-103, 2016 WL 6134493 at *2 (W.D.N.Y. Oct. 21, 2016) ("[n]othing in their motion demonstrates that a *Daubert* hearing or preclusion of evidence is necessary or warranted . . . the STRmix method is scientifically valid and can be applied in this

---

guidelines.

case").

FDLE, and other DNA labs across the country, utilize STRmix at two points in the DNA analysis process. The first, is when the DNA analyst, in this case Christina Russo, utilized STRmix to deconvolute a DNA mixture. The second, is when STRmix is utilized to calculate a likelihood ratio ("LR"). LR are statistical numbers calculated to assess the weight of the evidence. To calculate a likelihood ratio, two propositions are needed. For Item 25B, the propositions considered were: 1) the mixture originates from S.L., Jr. (Item 22), and an unknown contributor and 2) the mixture originates from S.L., Jr. and two unknown contributors. Hypotheses similar to this were tested during the FDLE internal validation.

Before arriving at these points in the analysis process, however, there is a multi-step process that is followed. In this case, Ms. Russo received swabs taken from the inside of the wallet, Item 25 B. After extracting the DNA from the swabs, Ms. Russo determined the amount of DNA that was present in the sample. Ms. Russo thereafter used a deconvolution process included breaking down the DNA mixture into its individual contributors. The initial STRMix mixture deconvolution for Item 25B was done using STRmix v2.4. The LR for this sample were calculated using v2.5.11. STRmix then calculated the mixture proportion for each contributor and assigned a percentage to each contributor. Here, STRmix assigned a mixture proportion for three contributors from Item 25B. The "major contributor" was calculated to be 93%,

9

contributor 2 was calculated to be 6%, and contributor 3 was calculated to be 1%[3]. S.L., Jr. was expected to be a contributor because the wallet belonged to S.L., Jr. and he was assigned to the 93% component of the sample. This was consistent with the expectations of Ms. Russo.

The FDLE internal validation testing included hypothesis testing or examining the behavior of the LR for the mixtures under different hypotheses of contributors, including known contributors and known non-contributors. A LR of 1 is uninformative or inconclusive, meaning that the mixture is equally well explained by the two propositions above. Likelihood ratios greater than 1 support inclusion, likelihood ratios less than 1 support exclusion. A mixture, when considering a known contributor should give an LR greater than 1. Similarly, a mixture, when considering a known non-donor should give an LR less than 1. Internal validation testing at FDLE showed that at low levels of DNA template the LR for known contributors tended towards uninformative or inconclusive. However, LRs of greater than 1 for known non-contributors and LRs of less than 1 for known contributors were seen. Therefore, based on the limitations in distinguishing between known contributors and known non-contributors seen in the FDLE validation and in other available validation data, FDLE set an inconclusive zone for LRs between 0.0001 to 10,000 for 3 and 4 contributor samples. If an LR falls in this range, the comparison is considered

---

[3] The United States would acknowledge that based upon its communications with FDLE personnel, this exact set of mixture circumstances was not seen during validation testing. However, FDLE did test over 150 different mixtures in a variety of different ways during internal validation, including mixture samples where there were one or more lower contributors, such as was found in Item 25B.

inconclusive rather than inclusionary or exclusionary. LRs in this range are not reported numerically; however, that information is present in the case file. As data becomes uninformative, LRs can become uninformative. Here, the hypotheses noted above were considered for this particular mixture and Item 118 (the Defendant) was the standard being compared. The LR for the mixture considering those hypotheses was 0.00061 which falls in FDLE's inconclusive range. Therefore, Ms. Russo cannot make any statements regarding the possible inclusion or exclusion of Item 118 to the sample. However, the fact that the sample was tested and subjected to the FDLE DNA analysis standards is relevant to the completeness of the investigation, including an item (S.L., Jr.'s) that jurors would expect law enforcement to have thoroughly investigated.

## II.     Rule 702 & *Daubert*

Rule 702 of the Federal Rules of Evidence establishes the basis for admissibility of testimony by an expert witness. The rule states:

   A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony has the burden of establishing, by a preponderance of the evidence, that the admissibility requirements of Rule 702 are satisfied. *Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987).

In determining what is admissible under Rule 702, the Court has a "gatekeeper role" by which it must make a "preliminary assessment of whether the reasoning or methodology underlying the expert testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmacies Inc.*, 509 U.S. 579, 592-93 (1993). In *Daubert*, the Supreme Court identified several non-exclusive factors to consider when assessing the reliability of expert testimony: (1) whether the concept has been tested, (2) whether the concept has been subject to peer review, (3) what the known rate of error is, and (4) whether the concept is generally accepted by the community. *Id.* at 593-94. The *Daubert* inquiry is a flexible one, and "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the circumstances of the case. *United States v. Brown*, 415 F.3d 1257, 1267-68 (11th Cir. 2005).

The court's gatekeeper role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quoting *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)). Moreover, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

attacking [debatable] but admissible evidence." *Daubert*, 509 U.S. at 596. Expert testimony should be admitted if it is based on sufficient facts, it "is the product of reliable principles and methods," and "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; see also *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

> In a criminal case, if the defendant, invoking his right under Federal Rule of Criminal Procedure 16(a)(1)(G), has obtained "a written summary of any testimony that the Government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence," the defendant should be in a position to support his objection to the opinion of a government expert with an *explanation of why he believes the opinion is unreliable*. Under this scenario, the government would be entitled to reciprocal discovery under Federal Rule of Criminal Procedure 16(b)(1)(C)(i) and thus should be able to explain why it objects to the reliability of a defense expert's opinion.

*United States v. Frazier*, 387 F.3d 1244, 1274 (11th Cir. 2004)(emphasis added).

### III.     Defendant's Motion for Daubert Hearing

The Defendant seeks a *Daubert* hearing to require the United States to establish that the use of the STRMix probabilistic genotyping software by FDLE was scientifically valid. Doc. 143. The Defendant acknowledges that he does not have the data to support his argument that samples developed by FDLE containing the DNA of at least three individuals "do[] not appear" to have been validated by FDLE using either version of the STRMix software. *Id.*

### IV.     Argument

The Defendant challenges[4] the use of STRMix in the analysis of complex

---

[4] The Defendant has not challenged the qualifications of Ms. Russo to testify in the field of DNA analysis. As

13

mixtures of DNA without offering any contrary scientific or medical expert[5] opinion. The Defendant simply claims that STRMix has not been sufficiently validated for analysis of complex DNA mixtures as found in Item 25B. The Defendant claims that additional data it is requesting from FDLE will support his argument, but he does not explain why it will support his argument. The Defendant does not cite to a study, article or opinion by any expert to support his claim. The Defendant's *Daubert* challenge lacks any contrary basis for the Court to conclude that the analysis conducted by Ms. Russo using STRMix is scientifically invalid.

Even assuming that FDLE did not use the exact same three-person mixture proportions as found in Item 25B for its internal validation of STRMix, FDLE did use internal validation testing that included over 150 different mixtures in a variety of different ways, including mixture samples where there were one or more lower-level contributors, as seen in Item 25B. Such broad-based internal validation testing, including hypothesis testing for LR ratios for the mixtures under different hypotheses of contributors, is why the FDLE analysis conducted using STRMix is scientifically reliable and should be admitted at trial.

Even though the results of Item 25B provided an inconclusive finding regarding the inclusion of the Defendant's DNA, the fact that the analysis was conducted and did identify a major contributor is relevant to the thoroughness of

---

a result, this argument will not address her qualifications which are otherwise outlined in her curriculum vitae, Doc. 132, Attachment A.
[5] The Defendant has not disclosed an expert in reciprocal discovery.

14

the investigation. The Defendant stands accused of having committed a robbery and the jury should be entitled to know that law enforcement attempted to identify DNA that was found on S.L., Jr.'s wallet, the assumed location of the currency that was taken. The fact that the DNA mixture was inconclusive as to the Defendant does not take away from the effort that was made to investigate it and such evidence is probative of the completeness of the investigation.

### V. The Defendant's Request for an Evidentiary Hearing Should Be Denied.

The Defendant's request for an evidentiary hearing should be denied. Whether a *Daubert* hearing is held is within the discretion of the Court and the Defendant has not provided any basis, even assuming the requested FDLE data is provided, for the Court to conclude that the DNA analysis conducted by Ms. Russo does not meet the *Daubert* standards. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct.1167, 1176, 143 L.Ed.2d 238 (stating that trial courts must retain the discretionary authority "both to avoid unnecessary 'reliability' proceedings ... and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises"). For these reasons, the Court should deny the request for an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the Defendant's Motion for Daubert Hearing.

                        Respectfully submitted,

                        ROGER B. HANDBERG
                        United States Attorney

By:   */s/ Jesus M. Casas*
        JESUS M. CASAS
        Assistant United States Attorney
        Florida Bar No. 0152110
        2110 First Street, Suite 3-137
        Ft. Myers, Florida 33901
        Telephone:  (239) 461-2200
        Facsimile:   (239) 461-2219
        E-mail: Jesus.M.Casas@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

D. Todd Doss
Todd_Doss@fd.org

Erin Brenna Hyde
Erin_Hyde@fd.org

                                                                            */s/ Jesus M. Casas*
                                                                            JESUS M. CASAS
                                                                            Assistant United States Attorney
                                                                            Florida Bar No. 0152110
                                                                            2110 First Street, Suite 3-137
                                                                            Ft. Myers, Florida 33901
                                                                            Telephone:  (239) 461-2200
                                                                            Facsimile:   (239) 461-2219
                                                                            E-mail: Jesus.M.Casas@usdoj.gov