UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.  CASE NO.: 2:19-cr-150-SPC-NPM

ALEX JARED ZWIEFELHOFER

## OPINION AND ORDER[1]

Before the Court is Defendant Alex Zwiefelhofer's Motion to Suppress (Doc. 140),[2] along with the Government's opposition (Doc. 156). Defendant moves to suppress all statements he made to law enforcement at Charlotte-Douglas International Airport on August 2, 2017, because the agents did not stop questioning him after he asked for a lawyer. The Government denies Defendant ever made such a request. Faced with a credibility question—did Defendant invoke his Fifth Amendment right to an attorney—the Court held an evidentiary hearing. The Court received two exhibits from the Government and heard testimony from Defendant and three officers:

---

[1] Disclaimer: By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or their services or products, nor does it have any agreements with them. The Court is not responsible for a hyperlink's functionality, and a failed hyperlink does not affect this Order.

[2] The Office of the Federal Public Defender ("PD") initially represented Defendant and filed the Motion. But the PD recused soon after. The Court then appointed Defendant new lawyers and gave them a chance to supplement the Motion. When the time to do so expired, the Court set the Motion for an evidentiary hearing.

1

1. Michael Newsom, United States Customs and Border Protection ("CBP") Officer and FBI Joint Terrorism Task Force Officer

2. Kristen Sheldon, Retired FBI Special Agent

3. Aleta Dunbar, Detective with Charlotte-Mecklenburg Police Department and Homeland Security Investigations

(Doc. 205). The Court reserved ruling at the hearing's conclusion but now issues this decision.

## BACKGROUND[3]

Defendant faces criminal charges related to a double murder and foreign mercenary work. (Doc. 32). Because his statements in question were made months before the indicted offenses, some background is needed.

In early 2015, Defendant enlisted in the United States Army. But his experience left much to be desired. He was cut from the Army Ranger program, struggled with alcohol and money, and felt targeted by his leaders. This, among other things, contributed to him going AWOL in September 2016.

Defendant's international escapades followed. He joined the French Foreign Legion but resigned to fight in the Ukraine. Defendant then travelled to Kenya to enter the South Sudan for more combat. But Kenyan authorities stopped him at the border and turned him over to the American military, who had an outstanding AWOL warrant for his arrest.

---

[3] Based on the testimony, evidence, and record, the Court makes these findings of fact material to the Motion.

So, on August 2, Defendant boarded an international flight to Charlotte-Douglas International Airport. Waiting for him stateside were Customs and Border Patrol (CBP) officers and Army soldiers. CBP officers escorted Defendant off the plane and handcuffed him in the jetway. They brought him to a small office in a secondary location of the airport. This location was separate from the public terminals and is where CBP investigates international travelers trying to enter this country but needing further inspection. Once inside the office, Defendant's handcuffs were removed, and he was given food and water. He was left alone in the locked office to await questioning.

From that point, Defendant was interviewed several times. According to Defendant, he first talked to agents from unknown agencies about being in Ukraine and Africa, but otherwise discussed nothing of note. He also testified that nobody read him *Miranda* rights and he had to answer questions before being released to the Army. The Government's witnesses explained that Defendant likely spoke to CBP officers for routine and preliminary questions about his identity and travels abroad.

When the unknown agents finished, Officer Newsom and Agent Sheldon entered to conduct an FBI re-entry interview. (Gov't Ex. 2). Their goal was to assess Defendant's threat to the United States. But before the interview, Officer Newsom read Defendant his *Miranda* rights, which Defendant waived.

3

Defendant testified, however, that he waived his rights because he had no other option since Officer Newsom and Agent Sheldon told him he was not free to leave. To compound matters, Defendant testified he asked for a lawyer soon after his waiver, which Officer Newsom and Agent Sheldon ignored.

Officer Newsom and Agent Sheldon tell a different story. They claim that Defendant neither asked for an attorney nor invoked any other *Miranda* right. Officer Newsom also denied ever telling Defendant he had no right to an attorney.

Turning to the interview's substance, Officer Newsom and Agent Sheldon asked Defendant about his overseas travels, the people he met, and the like. Defendant answered most questions and admitted to facts like going AWOL, having an alcohol problem while in the Army, joining the French Foreign Legion, travelling to the Ukraine to fight Russian separatists, and meeting the Boston bomber's father. But he held back on two topics: (1) biographical details about his foreign wife; and (2) shooting people in the Ukraine.

The interview with Officer Newsom and Agent Sheldon abruptly stopped when they learned of child pornography on Defendant's phone. At that point, Detective Dunbar took over with a criminal investigation. She read Defendant his *Miranda* rights and he signed a written waiver. (Gov't Ex. 1). After answering her questions, Detective Dunbar arrested Defendant.

## DISCUSSION

The Fifth Amendment protects a criminal defendant from being compelled "to be a witness against himself." U.S. Const. Amend. V. Because of a defendant's right against self-incrimination, any statements made during a custodial interrogation may not be used against him in court unless the government first advises the defendant of certain rights. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). These rights include the right to remain silent, to have an attorney present during interrogation, and to have a lawyer appointed to him if he cannot afford one. *Miranda*, 384 U.S. at 479. Pertinent here, a defendant who wishes to invoke his right to counsel must make an "unambiguous and unequivocal" request. *Davis v. United States,* 512 U.S. 452, 458-62 (1994). If a defendant makes that request, the interrogation must cease. But "an ambiguous or equivocal request does not obligate the police to stop the interrogation." *United States v. Mathis*, 778 F. App'x 816, 821 (11th Cir. 2019); *see also Davis*, 512 U.S. at 462.

A defendant may waive his *Miranda* rights. See *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (stating a defendant's statement made after his voluntary, knowing, and intelligent waiver of his *Miranda* rights is admissible). A waiver may be explicit or implied by a defendant's actions and words. See *North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979). Simply answering questions in a non-coercive interview after being explained

5

the *Miranda* rights is a valid wavier. See *Berghuis v. Thompkins*, 560 U.S. 370, 386-87 (2010).

Before discussing whether Defendant invoked his right to counsel, the Court must resolve three preliminary matters. First, recollections differ on how many interviews Defendant underwent on August 2. Defendant said four. The Government's witnesses said three. But the difference is immaterial because the Government only intends to introduce Defendant's statements made to Officer Sheldon and Agent Newsom. It does not intend to use his answers to the unidentified agents about his identity and travels abroad, or to Detective Dunbar about his phone's contents. The Court thus will focus its analysis on Defendant's interview with Officer Sheldon and Agent Newsom, and consider the other interviews as much as they offer insight on credibility.

Second, Defendant has labored to show how he experienced custodial interrogations to trigger the need for *Miranda* rights. The Court declines to go down that rabbit hole. Instead, the Court will assume (without deciding) that Defendant was in custody for *Miranda* purposes because all agree Officer Newsom read him the *Miranda* rights. See *United States v. Woods*, 684 F.3d 1045, 1055 (11th Cir. 2012) (assuming the defendant was in custody because he signed *Miranda* waiver forms that adequately conveyed his rights).

Third, Defendant commented during the hearing that the Government elicited no testimony the *Miranda* warnings were satisfactory. True. But

Defendant never challenged the adequacy of the *Miranda* warnings in his Motion. Nor did Defendant even hint that Officer Newsom fell short on the warnings he read to him during his testimony. So to the extent Defendant has belatedly tried to interject a sufficiency challenge to the *Miranda* warnings, the record forecloses any last-minute addition.

With that settled, the Court turns to whether Defendant invoked his right to counsel with Officer Newsom and Agent Sheldon. After considering the arguments, evidence, testimony, and case law, the Court finds he did not. In so finding, the Court credits the testimonies of Officer Newsom, Agent Sheldon, and Detective Dunbar. As seasoned law enforcement agents, they are all well-versed in the requirements of *Miranda*. Officer Newsom testified that he read Defendant his *Miranda* rights in case he made self-incriminating statements. Defendant also conceded he was read his rights and attached a document to his Motion confirming this point. (Doc. 140-3 at 3; Gov't Ex. 2 at 3). And there is no reason to doubt Defendant's full understanding of the *Miranda* rights and the consequences of abandoning them because of his intelligence and mental capacity. He is a native English speaker, graduated high school, and completed college-level courses. While testifying, Defendant appeared calm, collected, and able to follow the questions asked of him.

Next, other than Defendant's say so, the record does not support his contention he asked for a lawyer. Although Defendant no longer faces the

7

death penalty, he is still eligible for a lifetime sentence as a young adult. Put simply, Defendant has every incentive to be less than frank. Adding to that layer, Defendant admitted that his memory was fuzzy on the details of the August 2 interviews, which occurred nearly six years ago. For example, he contradicted whom he signed the *Miranda* waiver with—he said with the FBI, but it was actually with Detective Dunbar.

What's more, Defendant admittedly discussed all but two topics with Officer Newsom and Agent Sheldon, which shows his willingness to converse with them unassisted by counsel. Officer Newson and Agent Sheldon documented in writing the breath of topics they discussed with Defendant, which ranged from why he went AWOL, working for the French Foreign Legion, meeting his co-defendant in the Ukraine, witnessing war crimes and shooting grenades in the Ukraine, and being willing to "fight in the Philippians to live out a Vietnam War fantasy." (Doc. 140-3 at 8). Defendant did not hold back except with details on his wife and shootings in the Ukraine. But Officer Newsom and Agent Sheldon did not press Defendant for more details and moved on. Defendant's reluctance was short-lived, because he resumed speaking freely on other matters like why he left the Ukraine and where he traveled after.

Officer Newsom and Agent Sheldon were not the only agents to read Defendant his *Miranda* rights—Detective Dunbar did too. And he again

waived his rights but by written form. (Gov't Ex. 1). From there, Defendant freely agreed to talk to Detective Dunbar about child pornography allegedly found on his cell phone. Not only was he willing to answer those questions without an attorney present, but Defendant admitted details for most of the offense. Him doing so undeniably undermines his claim he earlier wanted an attorney present.

To try to discredit Officer Newsom and Agent Sheldon (and Detective Dunbar) at hearing, Defendant made much ado about the interviews not being recorded. According to Defendant, recordings would have solved any dispute on whether he asked for a lawyer but was ignored. Defendant is right—a recording would have been helpful in hindsight. But neither the Fifth Amendment nor other laws require custodial interrogations to be recorded. *See United States v. Boston,* 249 F. App'x 807, 810 (11th Cir. 2007) ("Although a rule requiring the government to record statements made during custodial interrogations might be sound policy, we agree with other circuits that have concluded that the Constitution does not require us to adopt such a rule."); *United States v. Huber,* 66 F. App'x 123, 124 (9th Cir. 2003) ("[The defendant] argues forcefully that it would be a wise policy to require the electronic recording of custodial interrogations, we find no legal basis for imposing such a requirement."). So the lack of a recording does not carry the day for Defendant. Still, Officer Newsom and Agent Sheldon credibly explained why

9

no recording exists. According to Officer Newsom, he believed he turned on the recording device before interviewing Defendant. Agent Sheldon completed the picture, explaining that neither she nor Officer Newsom knew the recording device was already on when they entered the room. So when Officer Newson went to turn on the recording device, he actually turned it off. And for the same reason— Defendant was considered no threat to the country—neither Officer Newsom nor Agent Sheldon was concerned about having no recording.

At bottom, Defendant offered no credible testimony or evidence about being unwilling to talk to Officer Newsom and Agent Sheldon. The record also lacks any evidence that the agents in anyway railroaded him into answering their questions. If anything, Defendant's exchange with Officer Newsom and Agent Sheldon showed his openness to speak with them without a lawyer.

Accordingly, it is

**ORDERED:**

Defendant Alex Zwiefelhofer's Motion to Suppress (Doc. 140) is **DENIED**.

**DONE and ORDERED** in Fort Myers, Florida on July 13, 2023.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All parties of record